John CHARALAMBAKIS, Appellant

v.

ASBURY UNIVERSITY,
et al., Appellees

2014–SC–000215–DG

Supreme Court of Kentucky.

RENDERED: MAY 5, 2016

COUNSEL FOR APPELLANT: Katherine Yunker, Yunker Law, PLC

COUNSEL FOR APPELLEE: Debra H. Dawahare, Leila Ghabrial O'Carra, Wyatt, Tarrant & Combs, LLP

## OPINION OF THE COURT BY JUSTICE VENTERS

Appellant, John Charalambakis, appeals from a decision of the Court of Appeals which affirmed the summary judgment entered in the Jessamine Circuit Court dismissing Appellant's KRS 344.040 wrongful discrimination claim and his KRS 344.280 wrongful retaliation claim brought against his employer, Appellee Asbury University (Asbury). Appellant's lawsuit centered upon allegations that Asbury discriminated against him in an employee disciplinary matter because of his national origin, and then retaliated against him because he attempted to vindicate his rights by filing a complaint with the Kentucky Commission on Human Rights.

In addition to his argument that the summary judgment was erroneously granted, Appellant argues that his KRS 344.280 retaliation claim is not defeated by either: 1) his failure to attain a successful outcome in his underlying discrimination claim; or 2) his failure to demonstrate that his civil rights claim was filed in good faith.

The standard of appellate review of a trial court's decision to grant a motion for summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky.App.1996); CR 56.03. "The trial court must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor." *Lewis v. B & R Corporation*, 56 S.W.3d 432, 436 (Ky.App. 2001) (citing *Steelvest, Inc. v. Scansteel Service Center, Inc., 807* S.W.2d 476 (Ky. 1991)).

For the reasons stated below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Construing the factual allegations in the light most favorable to Appellant, the relevant facts are as follows. Appellant, a native of Greece, was hired as an economics professor at Asbury in 1992.[1] Asbury

1. There are references in the record that Appellant's hire date was in 1991. At that time

is a privately-owned Christian college, which consistent with its mission, imposes various religious-based standards of conduct upon its professors and other employees, in addition to the more conventional, secular standards ordinarily found in employee handbooks.

Appellant was granted tenure in 1996 and promoted to full professor in 2003. Between 1992 and 2007, Appellant was a popular economics professor at Asbury, performing his teaching duties without controversy. In mid-2007, Asbury hired Jon Kulaga as the new provost. Not long after Kulaga's arrival, Appellant alleges that he "made fun" of Appellant's Greek accent by asking him if his students "could understand him." Later, when Appellant expressed a desire to be named as chairman of the economics department, Kulaga responded, "But John, you have an accent." An American-born professor received the appointment.[2] On yet another occasion, Appellant complains that Kulaga referred to his Greek accent as "funny." When Appellant, with the support of a student group, sought to be appointed as the group's faculty adviser, Kulaga passed over Appellant and appointed an American-born professor. On that occasion, Kulaga made no specific reference to Appellant's accent or his national origin.

Although Appellant raised no formal objections when the above-described incidents occurred, the events would later serve as the principal evidence supporting his claim that Asbury discriminated against him in a 2009 disciplinary matter. The disciplinary action arose in connection with business interests Appellant pursued outside his work for Asbury. Appellant was involved in several personal business ventures and nonprofit charitable activities. He employed three former students in his businesses who, in 2009, complained to Kulaga that Appellant was engaged in questionable conduct in the management of his business. They claimed that Appellant failed to pay them for their work; that he broke promises involving pay increases and bonuses; that he rudely berated them; that he failed to pay the payroll taxes withheld from their pay; that he charged personal expenditures to a nonprofit's credit card; and that he was involved in a venture to import wine into the United States in conflict with Asbury's religious policies pertaining to alcohol consumption.

Another Asbury graduate told Kulaga that Appellant had solicited a substantial sum of money from investors, including the Wesley Biblical Seminary, for a French construction project. The project was never completed, and although Appellant eventually refunded the Seminary's investment, he did not repay other investors. Another allegation brought to Kulaga's attention was that Appellant had misled investors and received substantial contributions in relation to a Greek hospital construction project that was never completed.

In a letter dated June 17, 2009, alluding to the conduct described above, Kulaga notified Appellant that he had received "information regarding [Appellant's] alleged professional misconduct," serious enough to "merit reconsideration of [Appellant's] continued employment" at Asbury. The letter requested a meeting with Appellant to discuss the allegations. Appellant responded that he would prefer to

---

Asbury University was known as Asbury College.

**2.** Appellant had previously served as chairman of the department and the University identifies this as an important factor in denying his request for a second tenure in the position.

be first informed about the specific allegations and the evidence supporting them.

In a follow-up letter, Kulaga more specifically outlined the allegations. Appellant responded with a letter saying that the allegations were "entirely baseless;" and that Kulaga's "accusatory tone" and "unsubstantiated allegations" could be construed "as a sort of retaliation for my courageous stands I have take at the institution across the years, and for my having spoken truth to power." Appellant's response included no mention of his national origin as the basis of retaliation. By reply letter, Kulaga asked Appellant to provide information about the pending complaints, including a disclosure of his outside business interests and additional information concerning the wine importing business.

Appellant provided a limited response to Kulaga's request for information, but he also claimed that some of the information was confidential and would only be provided during an in-person meeting. Appellant requested a meeting with Kulaga and the Faculty Personnel Committee (FPC). Kulaga informed Appellant that his response was insufficient and that the applicable policies contained no provision for involving the FPC at that juncture. Kulaga requested Appellant's full compliance with the earlier request for information so that Kulaga could conclude his investigation of the complaints about Appellant's conduct. Appellant provided the additional information about the wine business and his other business relationships. In his written correspondence, Appellant reminded Kulaga of past allegations against other faculty members, stating:

The only difference between these colleagues and me, other than the fact that I have done nothing wrong, is that they are native-born Americans and I am not. I consider this unlawful discrimination. Your unlawful discrimination is evidenced in part by your mocking of my accent, which you have done in the past.

This letter, coming several months after Kulaga first notified Appellant of the pending disciplinary claims, was the first reference in the discourse to Appellant's national origin. On November 9, Appellant informed an Asbury administrator that he intended to file a civil rights complaint. Two weeks later, on November 24, Kulaga issued his report on Appellant's disciplinary matter.

Kulaga directed that Appellant would be placed on probationary status for two years, during which time he was not permitted to engage directly or indirectly in outside business activities. Kulaga's report further stated that Appellant's failure to comply with the conditions of probation would result in the immediate termination of his employment at Asbury. Consistent with Asbury's applicable policies, Appellant appealed the decision to the Faculty Appeals Committee, which unanimously affirmed Kulaga's decision. Appellant then formally agreed in writing to abide by the decision, including the prohibition against his participation in outside business ventures.

On January 15, 2010, Appellant filed a "Charge of Discrimination" form with the Kentucky Commission on Human Rights alleging national origin discrimination. His complaint alleged the following:

I am a Greek male residing in Nicholasville, Jessamine County, Kentucky. This incident occurred in Wilmore, Jessamine County, Kentucky.

On or about November 24, 2009, I was placed on probation for allegations of professional misconduct by the Provost, Jon Kulaga. The allegations are false. The disciplinary action has resulted in loss of income. Mr. Kulaga has repeatedly mocked my accent, and treated me differently than similarly situated

employees of American decent [sic]. I believe I was placed on probation, and harassed because of my national origin, Greek.

I hereby charge the Respondent with a violation of Title VII of the Civil rights Act of 1964, as amended, and KRS 344.040, in that I was placed on probation, and harassed because of my national origin, Greek. This has caused me embarrassment and humiliation as well as lost wages and benefits I would have otherwise earned if not for this unlawful discrimination.

We construe Appellant's complaint as relating directly to the disciplinary proceeding against him, with the gravamen of the claim being that he was accorded disparate treatment in the disciplinary process and punished more harshly, because of his national origin. Based upon Appellant's specific allegations, we do not construe his filing as a generalized claim of a hostile workplace environment relating to Kulaga's references two years earlier to Appellant's accent; nor do we construe the complaint as being directly tied to the provost's decision to designate another person as chairman of the economics department.

While the civil rights claim was pending, in March and April of 2010, Kulaga reviewed Appellant's compliance with the probationary terms and concluded that Appellant was in violation of its provisions. Consequently, by letter dated April 14, 2010, Kulaga terminated Appellant's employment with Asbury. Shortly afterwards, Appellant voluntarily dismissed the claim he had filed with the Kentucky Commission on Human Rights.

On August 3, 2010, Appellant filed a suit against Asbury alleging breach of his employment contract, defamation, national origin discrimination, and retaliation under KRS 344.280(1). The trial court granted Asbury's motion for summary judgment on the defamation, discrimination, and retaliation claims. The contractual claim went to trial, resulting in a jury verdict for Asbury, rejecting Appellant's breach of contract claim. In connection with that verdict, the jury specifically found that Asbury had good cause to terminate Appellant's employment despite his status as a tenured professor. The Court of Appeals affirmed. We granted discretionary review.

Appellant has abandoned appellate review relating to his unsuccessful claims for breach of contract and defamation; those issues are not before us. We address only the claims relating to the dismissal on summary judgment of Appellant's claims that Asbury unlawfully discriminated against him of the basis of his national origin and that Asbury unlawfully retaliated against him because he pursued redress for the alleged unlawful discrimination.

■ We first address Appellant's claim that the trial court erred by awarding Asbury summary judgment on his national origin discrimination claim. Because of the substantial similarity of the respective texts and objectives, we interpret the civil rights provisions of KRS Chapter 344, in both the discrimination and retaliation contexts, consistent with the analogous federal anti-discrimination statutes. *Williams v. Wal–Mart Stores, Inc.,* 184 S.W.3d 492, 495 (Ky.2005) (citing *Brooks v. Lexington–Fayette Urban County Housing Authority,* 132 S.W.3d 790, 802 (Ky.2004); *Howard Baer, Inc. v. Schave,* 127 S.W.3d 589, 592 (Ky.2003); *Bank One, Kentucky, N.A. v. Murphy,* 52 S.W.3d 540, 544 (Ky.2001); *Ammerman v. Board of Education of Nicholas County,* 30 S.W.3d 793, 797–98 (Ky.2000)). We therefore frequently rely upon federal civil rights decisions in our review.

## II. NATIONAL ORIGIN DISCRIMINATION CLAIM

KRS 344.040(1)(a) makes it unlawful for an employer to "fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's ... national origin...." Similarly, under KRS 344.040(l)(b), it is unlawful for an employer to "limit, segregate, or classify employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect [his] status as an employee, because of the individual's ... national origin...."

Stated generally, KRS 344.040 prohibited Asbury from making employment decisions adverse to Appellant because of his Greek origin. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."). The principal issue with respect to our review of the summary judgment question is whether Appellant brought forth sufficient evidence to demonstrate the existence of a genuine issue of material fact with respect to his claim of discrimination to enable a reasonable jury to return a verdict in his favor. For the reasons explained below, we believe that he has not.

██ A plaintiff who suffers an adverse employment action or a deprivation of employment opportunities may demonstrate national origin based discrimination through direct evidence of the employer's discriminatory animus, or through circumstantial evidence of the employer's discriminatory animus developed through the burden-shifting framework contained in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Williams*, 184 S.W.3d at 495.[3] Appellant argues that he had both direct evidence and circumstantial evidence sufficient to demonstrate that Asbury was not entitled to summary judgment. We address his direct evidence argument first.

██ *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir.2004), summarizes the process by which an unlawful discrimination case is proved by direct evidence. As explained in *DiCarlo*:

[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. [T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [national origin], but also that the employer acted on that predisposition. Finally, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.

---

**3.** *Williams* was an age discrimination case; however, as relevant to our review, the same principles are applicable in this national origin discrimination case.

*Id.* at 415 (internal quotations and citations omitted).

■ Appellant cites as direct evidence of Asbury's discriminatory animus toward him the disparaging references to Appellant's accent, what he refers to as Kulaga's "nativist bias," and what he perceives as more lenient disciplinary dispensations rendered in cases involving American-born professors. We are not persuaded the cited evidence qualifies as direct evidence of national origin discrimination in the disciplinary proceedings.

■ As explained in *DiCarlo*, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id.* at 415 (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003)). The evidence, standing alone, must demonstrate discriminatory motivation. *Id.* To qualify as direct evidence, the evidence must connect the motivating animus to the adverse action without relying upon inferences, like the employer's admission in *Akouri v. Florida Department of Transportation*, 408 F.3d 1338, 1347–48 (11th Cir.2005). There, a supervisor's statement that the plaintiff had not been promoted because his fellow employees "are all white and they are not going to take orders from you, especially if you have an accent" constituted direct evidence of discrimination "because the statement relates directly to the [employer's] decision … and blatantly states that the reason [that the plaintiff] was passed over for the promotion was his ethnicity."

Assuming the truth of Appellant's allegations that Kulaga had derisively commented upon his accent and that other professors received more favorable disciplinary treatment for similar misconduct, an inference is still required to connect the disciplinary measures taken by Asbury to a bias against foreign-born professors. Appellant's proffered evidence alone does not prove his cause of action. Proving retaliation requires the additional inference that the Kulaga's bias was at least a motivating factor for the disciplinary action underlying Appellant's retaliation claim. Appellant's evidence is circumstantial, not direct, and therefore it requires analysis under the *McDonnell Douglas Corporation v. Green* burden shifting process.

■ In the context of a national origin based discrimination claim, the *McDonnell Douglas* framework provides that a plaintiff establishes a prima facie case of national origin discrimination by proving that he: (1) was a member of a protected class, (2) was discharged, (3) was qualified for the position from which he was discharged, and (4) was replaced by a person outside the protected class. *Williams*, 184 S.W.3d at 496 (citing *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 349 (6th Cir.1997); *The Board of Regents of Northern Kentucky University v. Weickgenannt*, 485 S.W.3d 299, 305–306 (Ky.2016). Appellant easily satisfies this initial phase of the *McDonnell Douglas* framework: his national origin (Greece) places him within a protected class, he was discharged, he was qualified for the position from which he was discharged, and he was replaced by an American-born professor.

■ "Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the termination decision. The defendant bears only the burden of production and this involves no credibility assessments." *Williams*, 184 S.W.3d at 497 (internal citations and quotation marks omitted).

■ As detailed above, and recognizing that credibility is not part of our assessment, Asbury articulated a legitimate nondiscriminatory reason for its initial decision to discipline Appellant: Appellant had engaged in improper conduct involving his former students; he had engaged in malfeasance related to his personal business and charitable interests; and he had laid plans for engaging in the sale of alcoholic spirits—all of which violated provisions of Asbury's Faculty Manual. Asbury also articulated a legitimate nondiscriminatory reason for later terminating Appellant: he violated the terms of his probationary status and his written agreement by continuing his involvement in outside business interests offensive to the University. Thus, Asbury satisfied its burden under the second prong of *McDonnell Douglas* by providing a legitimate, nondiscriminatory reason for its disciplinary actions against Appellant.

■ If the employer satisfies its burden of providing a legitimate, nondiscriminatory reason for the adverse employment action:

· the plaintiff must persuade the trier of fact, by a preponderance of the evidence, that the defendant unlawfully discriminated against her. [*Reeves,* 530 U.S. at 142, 120 S.Ct. 2097]. In order to prevail, the plaintiff must typically demonstrate that the employer's stated reason for the termination was merely a pretext, masking the discriminatory motive. *Id.* In other words, a plaintiff is required to "produce sufficient evidence from which the jury [could] reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems., Co.,* 29 F.3d 1078, 1083 (6th Cir.1994).[4] In *Manzer,* the court listed three methods

for establishing pretext: (1) the proffered reasons are false; (2) the proffered reasons did not actually motivate the decision; and (3) the plaintiff could show that the reasons given were insufficient to motivate the decision. *Id.* at 1084.

*Williams,* 184 S.W.3d at 497. Thus, under the *McDonnell Douglas* framework, Asbury's articulation of valid reasons for its disciplinary actions, shifted the burden to Appellant to produce evidence sufficient to persuade a jury (or other trier of fact) that Asbury's explanation was pretextual, masking its actual discriminatory motive.

■ At this stage of our analysis, we simply engage in the conventional review of the sufficiency of evidence to defeat a summary motion. We accept as true Appellant's assertion that Kulaga made at least three comments mocking Appellant's Greek accent: 1) when asked whether his students could understand him; 2) when, in response to Appellant's desire to be appointed as chair of the economics department Kulaga responded "but John, you have an accent;"[5] and 3) when Kulaga, in discussing a literary work, referred to Appellant's "funny" accent. We also accept as true Appellant's assertion that Kulaga made more lenient disciplinary decisions when American-born professors were involved. And, we accept as true that Kulaga passed over Appellant for appointment as chair of the economics department and as the faculty adviser for a student group in favor of American-born professors. Nevertheless, as explained below, we are unpersuaded that these facts are sufficient to create a genuine issue regarding the material fact that illegal discriminatory bias was a motivating factor

---

**4.** Overruled on other grounds by *Geiger v. Tower Automotive,* 579 F.3d 614 (6th Cir. 2009).

**5.** Appellant retreated from this version of events in his deposition.

for Asbury's initiation of disciplinary proceedings against Appellant and its initial and ultimate disciplinary decisions.

 Because a person's accent is often an indicator of his or her national origin, discrimination against an employee because of speech characteristics may support a claim of national origin discrimination. *Rodriguez v. FedEx Freight East, Inc.*, 487 F.3d 1001, 1009 (6th Cir.2007). However, in *Clark County School District v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001),[6] the Supreme Court made clear that: "a recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* (citing *Faragher v. Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

Kulaga's references to Appellant's accent were all uttered in 2007, long before the 2009 instigation of the disciplinary action. While the comments revealed Kulaga's conscious awareness of the obvious fact that Appellant spoke with a prominent accent, taken collectively at face value they do not suggest a derogatory attitude against foreign-born speakers generally or Greek natives in particular. Kulaga's comments could be regarded as inappropriate and impolite, insulting to some and embarrassing to others, but they seem to fit comfortably within the category of "simple teasing, offhand comments, and isolated incidents" cited in *Breeden*. We are unpersuaded that such meager expressions could reasonably be considered to be "a motivating factor" in the disciplinary action which occurred two years later, especially in light of the alternative motivation provided by Appellant's undisputed business activities and the complaints they generated. Given the extensive record complied by Asbury in connection with Appellant's business interests, his questionable investment solicitations, and his work to import and market wine in derogation of Asbury's religious tenets, we are satisfied that a reasonable jury could not reasonably conclude that the initiation and prosecution of disciplinary measures against Appellant was a pretext for discrimination based upon his Greek heritage.

Appellant's evidence of more favorable treatment toward American-born professors in other disciplinary proceedings is also insufficient to generate a genuine issue of fact requiring resolution by a jury. The disciplinary proceedings cited by Appellant were quite different in scope, subject matter, and quantity than the charges brought against him. That dissimilarity negates the probative value of the other proceedings as evidence of disparate treatment, and thus could not support a reasonable belief that the disciplinary proceedings against Appellant were to any extent motivated by discriminatory animus against Greeks. Appellant had agreed to the two-year probationary terms, which would have resolved the matter with Appellant's continued employment at Asbury, if he had complied.

It is significant that Appellant's breach of contract claim, which survived Asbury's motion for summary judgment, was eventually submitted to the jury on the question of whether, in light of Appellant's tenured professor status, Asbury had sufficient cause for terminating Appellant's employment. The jury found as a matter of fact the Asbury *did* have sufficient cause for undertaking the disciplinary measure in connection with Appellant's outside

---

**6.** *Clark County School District v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) arose in the context of a Title VII sexual harassment claim.

business activities, despite his tenured status. The jury finding on that point is wholly inconsistent with Appellant's claim that Asbury was substantially motivated by a discriminatory animus against his Greek heritage.

In summary, Appellant lacks direct evidence that Asbury's disciplinary action was motivated by discriminatory animus toward him. He has also failed to demonstrate under the *McDonnell Douglas* burden shifting analysis that his circumstantial evidence of discriminatory treatment is sufficient to disprove Asbury's proffered reasons for its disciplinary decisions. We therefore agree with the Court of Appeals that the summary judgment on this aspect of Appellant's claim was properly granted.

### III. RETALIATION CLAIM

Appellant also contends that the trial court erred by granting Asbury's motion for summary judgment on the retaliation claim. Although the disciplinary proceedings, which began in June 2009, obviously preceded the filing of Appellant's civil rights complaint in early 2010,[7] Appellant contends that Kulaga's November 24, 2009 decision to impose probationary discipline was done in retaliation against Appellant's revelation in November 2009 that he intended to file a civil rights claim. Appellant contends the subsequent termination of his employment after the decision of the Faculty Appeals Committee was retaliation for actually filing the civil rights complaint.

Before addressing the merits of the summary judgment dismissing Appellant's retaliation claim, we must confront two ancillary issues raised by the parties: 1) whether the plaintiff in a retaliation action brought under KRS 344.280 must make a showing of good faith in the filing of the underlying civil rights claim, and 2) whether the plaintiff whose underlying civil rights claim did not succeed, may nevertheless proceed to establish a retaliation claim.

### A. Necessity of Good Faith in Filing the Underlying Discrimination Claim

The retaliation statute, KRS 344.280(1), makes it unlawful for a person:

> To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under this chapter.

Appellant contends that KRS 344.280(1) does not require the plaintiff claiming unlawful retaliation to plead or prove that he acted in good faith when he "opposed a practice declared unlawful in Chapter 344" or "made a charge, filed a complaint, testified, assisted, or participated in any investigation, proceeding or hearing" under Chapter 344. We agree.

Our agreement with Appellant's position is not in conflict with either federal or our own precedent. "[U]nder the federal rule, all that is required to obtain retaliation protection under KRS 344.280(1) is that the employee have "a reasonable and good faith belief" that the adverse employment practices she opposed were KCRA violations. *Wasek v. Arrow Energy Services, Inc.*, 682 F.3d 463, 469 (6th Cir.2012) (quoting *Johnson v. University of Cincinnati*, 215 F.3d 561, 579 (6th Cir.2000))." *Asbury University v. Powell*, 486 S.W.3d 246, 253 (Ky.2016). "And whether that belief is reasonable or in

---

**7.** While Appellant submitted his claim to the Kentucky Commission on Human Rights in January 2010, the agency did not stamp his submission as filed until February 2010.

good faith is a question for the jury," *id., if the* defendant-employer advances sufficient proof at trial to place the good faith and reasonableness of the plaintiffs belief in doubt so as to be entitled to a jury instruction on the issue.

▮ We begin with the fundamental precept that "[t]he presumption of innocence, fair dealing, and good faith attends all lawful transactions among men." *Dennis v. Thomson*, 240 Ky. 727, 43 S.W.2d 18, 22 (1931). Thus a civil rights complainant under KRS Chapter 344 is entitled to the presumption that he is acting in good faith. The retaliation statute itself has no explicit requirement that a plaintiff affirmatively prove his good faith in the underlying civil rights matter. KRS 344.280(1) is otherwise clear and unambiguous, and so in keeping with our practice of interpreting statutory provisions faithfully to their text, we will not read into KRS 344.280(1) an element of good faith which the legislature did not put there. *Wilburn v. Commonwealth*, 312 S.W.3d 321, 328 (Ky.2010) ("If the literal language of a statute is clear and unambiguous, it must be given effect as written.").

▮ It follows that a plaintiff in a KRS 344.280(1) retaliation action need not plead that his conduct underlying the retaliation claim was undertaken in good faith. And, he need not present affirmative evidence of his good faith in order to defeat a summary judgment motion, nor does he bear the burden of persuasion at trial that he engaged in good faith in the underlying civil rights matter.

▮ On the other hand, the defendant accused of wrongful retaliation under KRS 344.280(1) may in defense present evidence of the plaintiffs lack of good faith in the underlying matter to show that the plaintiff had not actually "opposed a practice declared unlawful by [Chapter 344]" or "made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under [Chapter 344]". For example, an employee who, in bad faith, filed a fabricated civil rights claim with the Kentucky Commission on Human Rights, or participated in a fabricated claim filed by another, is not protected by KRS 344.280(1) from the employer's retaliatory response. Evidence negating good faith would be relevant to refute the plaintiff's claim that had actually engaged in the protected conduct underlying his retaliation claim.

Asbury contends that Appellant does not present a valid claim of retaliation because his underlying discrimination claim was brought purely to attain a tactical lever to use in Asbury's disciplinary action against him. Asbury may assert that defense, not because it negates a non-existent element of good faith, but because it disproves Appellant's claim that he acted in opposition to a civil rights violation. Asbury asserts that Appellant first threatened to file, and then actually filed, a discrimination complaint with the Commission on Human Rights solely for the purpose of impeding the ongoing disciplinary process, to intimidate Kulaga, and to provide an incentive for Asbury to relent in its effort to discipline his conduct.

Appellant denies this motivation, and for purposes of summary judgment, his assertions are accepted as fact. Nevertheless, for the reasons explained herein, Appellant's motivation for bringing the underlying claim is not the dispositive issue upon which the correctness of Asbury's summary judgment depends.

**B. Necessity of Success in the Underlying Discrimination Claim**

▮ Appellant eventually withdrew his civil rights claim alleging discrimination based upon national origin, and therefore

his claim cannot be regarded as successful. Appellant argues that a plaintiff need not succeed in his underlying civil rights complaint in order to prevail on a subsequent retaliation claim. Appellant suggests that the trial court granted the summary judgment, and the Court of Appeals affirmed it, based upon the fact that his civil rights claim was not successful. We see no reference in the opinion of either tribunal linking the summary judgment on Appellant's retaliation claim to the lack of success of his underlying national origin claim.[8] As with the "good faith" issue discussed above, KRS 344.280 does not include a "successful result" provision, limiting retaliation claims to complaints or other efforts in support of the civil rights law that are underpinned by a successful result. We decline to infuse the statute with such a provision. *Wilburn*, 312 S.W.3d at 328; *Asbury University v. Powell*, 486 S.W.3d 246, 252 (Ky. 2016) ("Thus, an underlying violation of the KCRA need not necessarily be proved to sustain a retaliation claim under KRS 344.280(1).").

The cause of action for wrongful retaliation established by KRS 344.280 may exist even when there is no underlying civil rights action to be successful. The statute bars retaliation or discrimination against a person because he has "opposed a practice declared unlawful by this chapter." Opposition to an unlawful practice need not be manifested by the filing of a civil rights claim or any other kind of proceeding which can be evaluated as "successful" or "unsuccessful." The plaintiffs in *Hill v. Kentucky Lottery Corporation*,

established a valid retaliation claim because they "opposed what they perceived as unlawful discrimination against a disabled [fellow] worker" by their employer. Their opposition to unlawful discrimination was manifested by their refusal to testify favorably for the employer at an unemployment compensation hearing. 327 S.W.3d 412, 416 (Ky.2010). "Opposing" practices declared unlawful by the civil rights statute can take many forms, many of which will never be adjudicated as successful or unsuccessful.

KRS 344.280(1) also authorizes a retaliation claim by one who "testified, assisted, or participated in any manner in any investigation" under the civil rights statute. Many investigations never reach the stage of formal adjudication and, therefore, cannot be validated as successful or unsuccessful, yet the cause of action still protects the participant who assisted or testified. Even claims which reach the stage of adjudication may be resolved by settlements ambiguous as to who succeeded and who failed.

The protection that the statute purports to provide would be entirely meaningless, and useless, if it extended its protection only to those whose claim succeeded. Victims of civil rights violations without ironclad cases, those with marginal cases dependent upon uncertain, uncooperative, or vulnerable witnesses would be better off to abandon their claims and suffer the illegal practices of civil rights violations, lest they proceed with a claim that falls short and leaves them to be victimized again by losing their jobs. We are satisfied that KRS

---

**8.** Appellant cites to filings made by Asbury in relation to its summary judgment motion and discussions at the summary judgment hearings in support of this notion. However, it is well established that a court speaks through its written decisions, and we therefore do not attribute the circuit court as having granted summary judgment on the retaliation claim as

depending exclusively, or even substantially, upon Appellant's lack of success in his underlying claim. *See Midland Guardian Acceptance Corporation of Cincinnati, Ohio v. Britt*, 439 S.W.2d 313, 314 (Ky.1968) ("Courts of record speak only by their orders duly entered and signed in the books provided for that purpose." (citation omitted)).

344.280 was not designed to protect from retaliation only the civil rights claimants who successfully navigate the process of vindicating their rights. The interpretation of KRS 344.280(1) advanced by Asbury runs contrary to the broad remedial purposes of KRS Chapter 344 expressed in KRS 344.020.

## C. Merits of Appellant's Retaliation Claim

■ "A claim for unlawful retaliation requires the plaintiff to first establish a prima facie case of retaliation, which consists of showing that '(1) she engaged in a protected activity, (2) she was disadvantaged by an act of her employer, and (3) there was a causal connection between the activity engaged in and the [defendant] employer's act." *Kentucky Department of Corrections v. McCullough,* 123 S.W.3d 130, 133–34 (Ky.2003), as modified on denial of rehearing (Jan. 22, 2004) (quoting *Kentucky Center for the Arts v. Handley,* 827 S.W.2d 697, 701 (Ky.App.1991)).

■ In *University of Texas Southwestern Medical Center v. Nassar,* —— U.S. ——, 133 S.Ct. 2517, 2528, 186 L.Ed.2d 503 (2013), the Supreme Court clarified that the causal-connection standard applicable to retaliation claims is the but-for standard. ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.") *Cf. Meyers v. Chapman Printing Company,* 840 S.W.2d 814, 824 (Ky.1992) ("The 'but for' test does not require that the jury find sex discrimination was the exclusive motive for the employee's discharge, but only that it was an essential ingredient. In a civil action seeking damages for a discharge motivated by sex discrimination, a 'but for' test is a fair interpretation of the substantial factor standard."); *see also Asbury University v. Powell,* 486 S.W.3d 246, 255 (Ky.2016)

("since the ultimate burden of persuasion is on the plaintiff, 'but for' causation suffices...."). Moreover, the term "but for" in the "but for" test does not in any sense refer to the *only* cause, or even the *primary* cause, of the challenged employment action. *Powell* at *10. "[R]ather, it need only be *a* (not "*the*") but-for cause of the decision." *Id.* (emphasis added).

Asbury commenced disciplinary proceedings against Appellant in June 2009, well before Appellant indicated in mid-November 2009 his intent to file a civil rights claim and before the actual filing of his claim in January 2010. The chronology of events precludes Appellant from showing that but for the filing of his civil rights claim, Asbury would not have initiated its disciplinary case against him. Therefore, the initiation of the disciplinary matter cannot be the retaliatory action forming the basis of his claim under KRS 344.280(1). Appellant's only remaining possibilities for a viable retaliation claim based upon the disciplinary process claim is that, but for Appellant's expressed intent to pursue a civil rights claim, the probationary discipline subsequently imposed would have been a lesser sanction, *or* that, but for the actual filing of his claim in January 2010, he would not have been terminated.

■ As with a national origin complaint discussed above, "where there is no direct evidence of retaliation ... the burden of production and persuasion follows the familiar *McDonnell Douglas* framework. Under this framework, after the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to show a non-retaliatory reason for the adverse employment decision that disadvantaged the plaintiff." *McCullough,* 123 S.W.3d at 134.

Appellant offered no direct evidence of retaliation to refute the motion for summary judgment, such as an admission by Kulaga or other decision maker that Appellant was disciplined more harshly because of either his threat to file a civil rights complaint or his actually doing so.[9] Turning to the *McDonnell Douglas* framework, Appellant easily made a prima facie case for retaliation: (1) he is a member of a protected class; (2) he filed a claim expressing opposition to an action declared unlawful under KRS Chapter 344; and (3) he suffered an adverse employment action—he was placed on probation and later discharged. Having satisfied these prerequisites, to avoid summary judgment Appellant had to show that he could present satisfactory evidence of "a causal connection between the protected activity and the adverse employment action." *Brooks*, 132 S.W.3d at 803, with causation being proven under the but for standard, *Nassar*, 133 S.Ct. at 2528.

As noted in the previous section, Asbury initiated the disciplinary proceedings more than five months prior to Appellant's pronouncement that that he intended to file a civil rights claim against the University. Moreover, in his initial communication to Appellant about his personal business dealings, Kulaga pointed out the seriousness of the allegations; he cited provisions of the applicable employment manual; and he cautioned that the charges were serious enough to warrant dismissal. The possibility of termination was placed on the table as a possible sanction well before any indications that Appellant would pursue remedies under the civil rights act. The notion that Appellant intended to file a civil rights complaint did not surface until two weeks before the announcement of Kulaga's disciplinary decision.

The timeline negates any possible inference that the disciplinary actions were brought as retaliation for Appellant's invocation of his rights under KRS Chapter 344. *Muñoz v. Sociedad Española De Auxilio Mutuo y Beneficiencia De Puerto Rico*, 671 F.3d 49, 56 (1st Cir.2012) ("An adverse employment decision that predates a protected activity cannot be caused by that activity."). Moreover, Appellant initially was placed on probationary status, rather than terminated, for what were clearly serious charges. The final step of termination was not taken until after Asbury discovered that Appellant had violated the conditions of his probationary status, with which he had agreed in writing to abide. Because Appellant was on notice that he would be terminated if he violated the probationary conditions and, indeed, he had pledged not to do so, Asbury's final decision to terminate his employment was consistent with the mutual plan of action in the event of a probation violation; it could not have been pretextual. Appellant could not possibly sustain his burden of proving at trial that Asbury's disciplinary actions were taken in retaliation for his filing of a complaint under KRS Chapter 344. He cannot prove the essential element of cau-

---

9. On pgs. 3–4 of his brief Appellant states: "Minutes from the 2/2/10 meeting between the [Faculty Appeals Committee] and [Asbury University President Sandra] Gray show that Gray told the [Faculty Appeals Committee] that Charalambakis had filed 'a formal discrimination complaint with the KCHR' and opined that this was grounds for termination." In support of this factual assertion Appellant cites to pg. 1062 of the circuit court record. Our examination of Appellant's cite does not confirm that President Gray opined that Appellant's filing of a civil rights claim against the University was "grounds for termination," much less that he was actually terminated for having done so. Accordingly we do not construe this inaccurate representation in Appellant's brief as direct evidence of retaliation.

sation, linking the adverse employment decisions to his civil rights claim. We conclude that the trial court properly granted summary judgment upon Asbury's motion, and the Court of Appeals correctly affirmed that decision.

## IV. CONCLUSION

For the foregoing reasons the judgment of the Kentucky Court of Appeals is affirmed.

All sitting. All concur.