NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0562n.06

No. 17-5025

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TERESA BLAIR, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | **FILED** |
| | ) | Oct 06, 2017 |
| v. | ) | DEBORAH S. HUNT, Clerk |
| | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MAXIM HEALTHCARE SERVICES, INC., | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellee. | ) | |
| | ) | |

Before:  SUHRHEINRICH, GRIFFIN, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge.  Maxim Healthcare Services, Inc. employed Teresa Blair as a nurse.  Maxim fired her after a supervisor noted "serious problems" with her performance. Blair sued for wrongful discharge.  The district court granted summary judgment to Maxim.  We affirm.

I.

Blair provided in-home medical care to Jordan Cottle, who suffered from cerebral palsy and mental retardation.  Cottle relied on a ventilator and tracheostomy tube to breathe.  Maxim's nurses cared for him 16 hours a day; Cottle's mother was responsible for the other eight.

During an annual performance review, Blair's supervisor told her to "report all inciden[ts]" involving Cottle or his family, which she did many times.  Beginning in 2009 and

continuing until her termination in 2014, Blair repeatedly told her supervisors that Cottle's mother had neglected Jordan's care. For instance, Blair complained to a supervisor that Cottle's mother was not mentally capable of caring for him. On another occasion, Blair told a supervisor that—after Cottle had been left in his mother's care overnight—Blair had found his ventilator disconnected.

Meanwhile, Blair had problems of her own: she had shown up at Cottle's house when not scheduled to work; made errors on Cottle's medical chart; failed to take Cottle's vital signs as required by his doctor; falsely reported that the doctor had ordered Cottle quarantined and that Blair alone care for Cottle while he had the flu; and attempted to change Cottle's schedule without her supervisor's permission.

On the morning of December 30, 2013, Blair arrived to find Cottle in distress. His ventilator was again detached and his tracheostomy tube was on the floor. Blair reattached the tube and removed secretions from his airway. She also tried unsuccessfully to wake his sleeping mother. Blair then called her supervisor, Jodi Ward, and told her what had happened.

Ward in turn called Kentucky's Child Protective Services and Cottle's doctor. Then Ward told Blair to call an ambulance. When Cottle arrived at the hospital, a doctor evaluated him and noted "normal vital signs and no clinical signs of illness or distress." Ward told Blair to turn Cottle's care over to the hospital staff. Yet Blair continued to shadow hospital staff until that evening. Cottle was released from the hospital the next day.

About a week later, Maxim gave Blair a written warning reciting that Blair had failed to follow her supervisor's instructions to let the hospital staff take over, among other things. Sixteen days after Cottle's release from the hospital, Susan Nutter—one of Blair's supervisors and a registered nurse—visited Cottle's home and noted some "serious problems." Specifically,

Blair had not placed the pulse-oximeter probe on Cottle's finger, which was a problem because the doctor (and Blair's supervisor) had ordered continuous use of the probe to measure Cottle's blood-oxygen saturation level. Blair had also failed to place Cottle's ambu-bag at his bedside. This device was supposed to be within arm's reach so that, in an emergency, Blair could use it to help Cottle breathe. Instead, it was in a closet on an upper shelf and the closet door was blocked by a large piece of equipment used to lift Cottle from his bed. A month before, Blair had been reprimanded for the same mistake. Nutter reported these problems to Blair's supervisor, Christy Mancuso, and Maxim's Director of Business Operations Kevin Sullivan. Maxim fired Blair the next day.

Blair thereafter sued Maxim in Kentucky state court, asserting wrongful-discharge claims. After Maxim removed the case to federal court under diversity jurisdiction, Blair amended her claims to assert that Maxim had discharged her in violation of Kentucky's Patient Safety Act. *See* Ky. Rev. Stat. § 216B.165. The district court granted summary judgment to Maxim on all claims. This appeal followed.

II.

We review the district court's grant of summary judgment de novo. *Mendel v. City of Gibraltar*, 727 F.3d 565, 568 (6th Cir. 2013).

The Patient Safety Act requires any "employee of a health care facility . . . who knows or has reasonable cause to believe that the quality of care of a patient, patient safety, or the health care facility's or service's safety is in jeopardy" to "make an oral or written report of the problem to the health care facility[.]" Ky. Rev. Stat. § 216B.165(1). The Act also prohibits any "health care facility or service" from retaliating "against any agent or employee who in good faith reports[.]" Ky. Rev. Stat. § 216B.165(3).

To prevail on her claim under the Act, Blair must show (i) that she engaged in a protected activity under the Act, (ii) that Maxim knew about her protected activity, and (iii) that Maxim took an adverse employment action against her because of it. *See Colorama, Inc. v. Johnson*, 295 S.W.3d 148, 152 (Ky. Ct. App. 2009). We focus on the element of causation here. *See CNA Ins. Co. v. Hyundai Merch. Marine Co.*, 747 F.3d 339, 371 (6th Cir. 2014). That element requires proof that the plaintiff's "protected activity was the likely reason for the adverse action." *Kentucky Dep't of Corr. v. McCullough*, 123 S.W.3d 130, 135 (Ky. 2003).

As proof of causation, Blair relies primarily on the temporal proximity between her putative protected activity (namely her complaint to Ward about Cottle's condition on December 30, 2013) and her firing 18 days later. But temporal proximity alone is often not enough to create a question of fact. *See, e.g.*, *McBrearty v. Kentucky Cmty. & Tech. Coll. Sys.*, 262 S.W.3d 205, 213 (Ky. Ct. App. 2008). And here, for several reasons, the probative value, if any, of that proximity is minimal. First, given the number of Blair's complaints about Cottle's mother, any adverse employment action would be close in time to a complaint—no matter when it occurred. Second, Blair's supervisor told her to "report all inciden[ts]" involving Cottle or his family, which she did many times without being punished for it. And third, as described above, the problems that Nutter observed were merely the latest in a long series for Blair. Hence the 18 days between her complaint and termination are not enough to allow a reasonable jury to find that one caused the other.

Blair contends that a jury could find causation because Maxim falsely, in Blair's view, accused her of interfering with the Kentucky Protective Services investigation of the December 2013 incident that sent Cottle to the hospital. And she also says that a trainee told her that she was going to be fired shortly before she in fact was. But these assertions are relevant to pretext,

not causation. And pretext is irrelevant here until Blair presents proof that creates a genuine

issue as to causation—which she has not presented. *See Charalambakis v. Asbury Univ.*,

488 S.W.3d 568, 583-85 (Ky. 2016).

\* \* \*

The district court's judgment is affirmed.