**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0169n.06

Case No. 19-5778

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Mar 24, 2020

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| GARY TURNER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| MARATHON PETROLEUM COMPANY, | ) | KENTUCKY |
| LP, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: STRANCH, READLER, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Gary Turner says Marathon Petroleum Company, LP, fired him because he is African American. Marathon says it fired Turner because he negligently closed the wrong valve on equipment at its oil refinery, which produced an unsafe buildup of pressure that could have caused a deadly explosion. We must decide whether Turner amassed enough evidence to show that Marathon's safety rationale for his discharge was merely cover for racial discrimination. The district court held that Turner had not done so. We agree and affirm summary judgment for Marathon on Turner's state-law discrimination claim.

Marathon operates refineries that turn crude oil into gasoline, asphalt, and other petroleum products. One refinery is located in Catlettsburg, Kentucky. Marathon runs this plant 24-7, relying on rotating shifts of "utility operators" to perform the day-to-day tasks that keep it going. As

detailed in the position's job posting, utility operators must learn the "refining process" and "complex refinery related material" so that they can handle many refinery-related tasks. Among other duties, utility operators make periodic rounds of the "tank farms" to check for abnormal readings, listen for odd noises, and monitor for gas leaks. Operators, for example, must ensure that the machinery never surpasses Marathon's "not-to-exceed" levels of pressure because those excessive levels could create risks to the equipment or those around it. Operators also must sometimes adjust equipment, including by opening and closing valves. And they must perform a "lockout/tagout" process to isolate equipment that is being taken out of operation for maintenance.

In June 2012 Marathon hired Turner as a utility operator. Upon hiring, he participated in months of computer-based and hands-on training. In October, he started working at the refinery for a 120-day probationary period. In a preliminary evaluation at the end of October, a reviewer ranked his overall performance on the low end of "On Target." The reviewer added that Turner did not meet expectations for his use of proper terminology and opined that he must "work on improving his understanding of process operations, including fluid dynamics, equipment and instrumentation functions, and terminology."

On December 26, Turner was in the unit of the refinery that turns "pure" gasoline into other forms of gasoline (for those with refining knowledge, the parties call this the "low pressure continuous catalyst regenerator" area). This area, like others, has a risk of fire and explosion. Turner was performing his usual morning checks when he received a call from the day foreman to come to the "steam drum." The foreman explained that they needed to take a sight glass on the drum out of operation so that maintenance could service a sight-glass valve. (A "sight glass" shows the level of liquid within a tank.) The foreman asked Turner to conduct the "lockout/tagout" process for the sight glass and explained how to do so. Yet, after finishing a few other tasks, Turner felt

2

unsure about how to conduct the lockout/tagout process. He went to the control room to look it up but was told that no written instructions existed and to "just be careful." Confused about what to do, he nevertheless opted not to ask for help. Instead of isolating the sight glass, Turner ended up closing a much larger steam-drum valve, causing the equipment to surpass its "not-to-exceed" level of pressure. A relief valve went off, which, Turner says, "scared the snot out of [him]." He evacuated the area per Marathon protocol and was able to quickly reopen the valve with another employee's help. That reopening released the built-up pressure.

Turner attended a meeting later in the day to discuss this incident with his supervisor and human resources. Turner admitted the severity of his mistake. Closing the wrong valve had "stopped the flow of steam from going through the process," which could have shut down the unit and potentially led to an explosion. According to his supervisor, Turner's actions had brought the unit to "the verge of an equipment failure." According to human-resources personnel, "[t]his incident demonstrated a gross misunderstanding of the refining process for his stage of training/employment and implicated serious safety concerns." On January 3, 2013, after completing its review, Marathon fired Turner while he was still a probationary employee.

Four years later Turner sued Marathon in state court, alleging that it had fired him because of his race in violation of Kentucky law. Marathon removed the suit to federal court on diversity grounds. The district court granted summary judgment to Marathon. It held that Marathon provided a legitimate reason for Turner's discharge ("his dangerous and reckless actions"), and that Turner failed to show that Marathon's safety reason was pretextual. We review that decision de novo. *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012).

The Kentucky Civil Rights Act makes it "an unlawful practice for an employer . . . to discharge any individual . . . because of the individual's race[.]" Ky. Rev. Stat. § 344.040(1)(a). This

language is "virtually identical" to the text in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). *Jefferson County v. Zaring*, 91 S.W.3d 583, 586 (Ky. 2002). To decide whether a court should grant judgment to the defendant in federal discrimination cases, the Supreme Court has long used the familiar burden-shifting approach from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141–43 (2000). Under this approach, an employee bears the burden of making a prima facie case of discrimination. *Id.* at 142. If the employee establishes this initial case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* If the employer does so, the burden shifts back to the employee to prove intentional discrimination by showing that the employer's articulated reason was not its true reason. *Id.* at 143.

But Turner's claim is under Kentucky law, not Title VII. Should we apply this *federal* burden-shifting approach to his *state* claim? That depends in part on whether the *McDonnell Douglas* burden-shifting approach is procedural or substantive. *Cf. Madej v. Maiden*, 951 F.3d 364, 373 (6th Cir. 2020); *see generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). If treated as procedural (whether as a gloss on the Federal Rules of Civil Procedure or as a federal common-law rule), *McDonnell Douglas* likely would apply to state discrimination claims even if a state court used an alternative approach to resolve them. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–99, 406–07 (2010). If treated as substantive (as a gloss on the federal antidiscrimination statutes), *McDonnell Douglas* likely would not apply to state discrimination claims if a state court used an alternative. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 426–31 (1996). Judges have disagreed over how to answer this difficult question. *Compare Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1092 (9th Cir. 2001) (procedural), *with Bourbon v. Kmart Corp.*, 223 F.3d 469, 474 (7th Cir. 2000) (Posner, J., concurring)

(substantive). We need not give an answer in this case. Kentucky courts have themselves long used the *McDonnell Douglas* approach to resolve claims under the Kentucky Civil Rights Act. *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 576 (Ky. 2016); *Bd. of Regents of N. Ky. Univ. v. Weickgenannt*, 485 S.W.3d 299, 306 (Ky. 2016). So even if the federal burden-shifting approach were substantive, it would still apply here as a matter of state law.

Because Marathon has offered a legitimate, nondiscriminatory reason for Turner's discharge (his lack of care in closing the wrong valve and risking an explosion), we jump immediately to the third burden-shifting step. To survive summary judgment at that stage, employees must "produce sufficient evidence from which a jury could reasonably reject [their employer's] explanation of why it fired" them. *Miles v. S. Cent. Human Res. Agency*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Employees typically try to establish this pretext "in one of three ways": (1) by showing that the employer's articulated reason "had no basis in fact"; (2) by showing that the reason would have been "insufficient to motivate the employer's action"; or (3) by showing that the reason "did not actually motivate" that action. *Id.* (citation omitted). Turner cites all three methods in this case. But none of these methods create a genuine issue of material fact over whether Marathon's safety reason for firing him was mere pretext for racial discrimination.

*No basis in fact?* Turner has not shown that Marathon's decision to fire him lacked a basis in fact. To do so, he must identify evidence from which a reasonable jury could conclude that "the facts underlying [Marathon's] allegations never occurred." *Id.* at 890. Here, however, it is undisputed that those facts did occur. To his credit, Turner forthrightly acknowledged—both at the time of the incident and in his deposition—that he mistakenly closed the wrong valve and caused the

5

refinery equipment to reach a not-to-exceed level of pressure. He also conceded that this conduct created significant safety risks. So this method of proving pretext does him no good.

*Insufficient for discipline?* Turner fares no better in suggesting that his actions did not warrant discharge. Refining oil into gas is a dangerous business. So, among the misconduct that is "serious enough to warrant discharge" immediately, Marathon's work rules identify: "Job negligence, unsafe work practices, performing work in a careless nature, or violation of any of the life critical rules." Turner's actions on December 26 fit that description. In Turner's own words, the manager who discharged him explained that "he didn't want me hurting co-workers nor myself because this industry is dangerous . . . he'd rather discharge me . . . than . . . have to tell my family or my co-workers' family that I've caused theirs or my own injury or death." Not only that, Turner was still a probationary employee at the time of this incident. Marathon thus could have fired him immediately without the progressive discipline that applied to non-probationary employees under the company's collective-bargaining agreement.

*Not an actual motivation?* Turner lastly cannot show that Marathon did not actually have safety concerns in mind when deciding to let him go. He suggests that Marathon could not have been motivated by these safety concerns because it did not fire three other white employees who (he claims without personal knowledge) made comparable mistakes but were retained: Jordan Daniel, Justin Turner, and Nick Warnock. Yes, a refusal to impose the same discipline on similarly situated employees who commit "substantially identical conduct" can be evidence of pretext. *Id.* at 893 (citation omitted). But no, Turner did not show that these employees were similarly situated. *See id.* at 893–94. The employees had different supervisors, committed acts that were not as negligent as Turner's, or did not put the safety of other employees in as much risk of harm. *See id.*; *see also, e.g.*, *Hardesty v. Kroger Co.*, 758 F. App'x 490, 495 (6th Cir. 2019); *Williams v. AT&T*

6

*Mobility Servs. LLC*, 847 F.3d 384, 398 (6th Cir. 2017); *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 744 (6th Cir. 2012).

Take Jordan Daniel. He kept his job even though he performed a deficient lockout on a pump. Yet Turner identifies no evidence that this mistake created the same not-to-exceed level of pressure buildup, risk of an explosion, or comparable danger that his conduct had created. *See Hardesty*, 758 F. App'x at 495. And a human-resource employee provided unrebutted testimony that Daniel's conduct was not as negligent as Turner's: "Locking out a pump is a more complex process than that of performing a lockout tagout of a sight glass." Daniel also had different supervisors and was not a probationary employee (so he was subject to the progressive-discipline rules). *See Jordan*, 490 F. App'x at 744.

Next consider Justin Turner. Justin Turner, according to Gary Turner, "left open a bleeder valve that caused a vapor cloud to go through the plant," halting operations for five minutes. Yet Justin Turner also had different supervisors. *See id.* And a human-resources employee again explained that his mistake did not exhibit the same "gross misunderstanding of the refinery process." Nor does the evidence suggest that Justin Turner's conduct had brought an area to "the verge of an equipment failure" or some comparable danger in the way that Turner's conduct had. *See Hardesty*, 758 F. App'x at 495.

Lastly turn to Nick Warnock. He did not properly close a drum, which caused a substance to splash in his face. Unlike Turner's actions, Warnock's actions did not put the safety of fellow employees at risk. *See id.*

Because Turner failed to present sufficient evidence of pretext, no reasonable jury could conclude that Marathon fired him because of his race rather than because of his conduct on

December 26.  We thus affirm.  Because Turner's appeal was not frivolous, however, we deny

Marathon's motion for attorney's fees and costs.  *See* Fed. R. App. P. 38.